STATE OF NEW JERSEY, RESPONDENT, v. NEW JERSEY INDEMNITY COMPANY, A BODY CORPORATE, APPELLANT.

Argued November 3, 1920—Decided April 7, 1921.

A contract made by the New Jersey Indemnity Company as so-called attorney in fact of certain "subscribers" to automobile insurance, whereby the company becomes the medium by which each subscriber fulfilled his obligation to indemnify each of his fellow subscribers who suffered a loss and received from each of his fellow subscribers the indemnity to which he was entitled, examined and *held* to be a contract of insurance by the New Jersey Indemnity Company, acting not as agent for the subscribers but as an insurance company; and it appearing that the company was thus doing a state-wide business with the public generally, it is *held also* that the company was engaged in the insurance business in violation of section 88 of the General Insurance act (chapter 134 of the laws of 1902, *Comp. Stat.*, *p.* 2867); and it is *further held* that the enforcement of the penalty provided for in section 89 of the act for a violation of section 88 does not violate the fourteenth amendment of the constitution of the United States nor paragraph 1 of article 1 of the constitution of the State of New Jersey.

On appeal from the First District Court of the city of Newark.

Before Justices TRENCHARD and MINTURN.

For the appellant, *Merritt Lane.*

For the respondent, *Thomas F. McCran,* attorney-general, and *William Newcorn,* assistant attorney-general.

The opinion of the court was delivered by

TRENCHARD, J. This is the appeal of the New Jersey Indemnity Company from a judgment against it in the District Court in favor of the state for the penalty of $500 provided for by section 89 of the General Insurance act (chapter 134 of laws of 1902; *Comp. Stat., p.* 2867), for a violation of section 88 of the act.

Section 88 is as follows:

"No person or firm nor any company organized under the laws of this state or of any other state or foreign country, himself, itself or theirselves, or by his, its or their brokers, agents, solicitors, surveyors, canvassers or other representatives of whatever designation, nor any such broker, agent, solicitor, surveyor, canvasser or other representative, shall solicit, negotiate or effect any contract of insurance of any kind, including all kinds of insurance described in this act, or sign, deliver or transmit, by mail or otherwise, any policy, certificate of membership or certificate of renewal thereof, or receive any premium, commission, fee or other payment thereon, on any property or thing, or on the life, health or safety of any person, or in any manner, directly or indirectly, transact the business of insurance of any kind whatsoever, within this state, unless such company, person or firm, shall be authorized to do the same under the provisions of the laws of this state."

The state of demand charged that the defendant, during the month of July, 1919, at the city of Newark, New Jersey, did solicit and effect contracts of insurance, and did sign and deliver the policies, and did receive premiums and other payments thereon for insurance on property and things and safety of persons, and did directly and indirectly transact the business of insurance within this state without being

authorized to do the same under the provisions of the laws of this state.

The court below found the defendant guilty upon proof of its having effected insurance on motor cars by means of advertisements, applications and policies hereinafter more particularly described.

We are of the opinion that the judgment is right.

The defendant first contends that it was not engaged in the insurance business within the meaning of the statute.

We are constrained to think that it was. The defendant was incorporated under the General Corporation act (Revision of 1896). Its certificate of incorporation discloses that among its objects is that of soliciting insurance. Of course under its charter it could not conduct an insurance business. The power granted to it is to solicit business as an agent or broker, and, under the provisions of the General Insurance act, it could not place the same except in an insurance company possessing a certificate of authority to do business within this state. Now the evidence shows that through the mails, and by advertisements in newspapers of state-wide and general circulation, it appealed to the general public for business. Under the plan set forth in the advertisements, an application, agreement, and power of attorney to the defendant, were executed by the "subscriber," who, in fact, was an applicant for insurance, and a deposit was made by him of "approximately the same amount he would pay to a stock company for the same insurance." As a result of the application and deposit, a policy was issued to the applicant, who paid the premium therefor. The deposit (says the advertisement) "bears no relation to the ultimate cost, but is simply used as a basis against which the expenses and losses are charged during the policy year. * * * Our expense is limited to twenty-five per cent."

An inspection of the applications and the policies proved at the trial, discloses that the unnamed "subscribers to Motor Car Underwriters at New Jersey Indemnity Exchange" severally agree to indemnify the subscriber named therein against certain specified losses, the amount of which shall be

ascertained by the subscriber and the attorney (*i. e.,* the attorney in fact) or if they differ, by two appraisers, one named by the attorney and one by the subscriber. In the event of their disagreement, an umpire is to be chosen, and the award in writing of two appraisers or an appraiser and the umpire is to fix and determine the amount of the damage. The exchange and the subscriber are each to pay his own appraiser and to bear equally the other expenses of the appraisers and the umpire. No suit is to be brought until this condition has been complied with. Upon payment of any loss the exchange is to be subrogated to the extent of the loss to all rights of recovery by the subscriber. The exchange may take over and conduct, in the name of the subscriber, the defence or prosecution of any claim or suit for indemnity, damages or otherwise against any third person. The contract may be canceled by either party upon five days' prior written notice to the other. Notice of cancellation mailed by either party to the other's address is declared to be sufficient notice. No action by a subscriber shall lie against the attorney or any of the subscribers at the exchange to recover for any loss under the contract unless brought by the subscriber himself. To avoid a multiplicity of suits, no suit or other proceeding at law or in equity was to be maintained for the recovery of any claim upon, under, or by virtue of the contract, against more than one of the subscribers. Each subscriber agrees to accept and abide by the result as if he had been sole defendant in a similar suit or proceeding. The attorney is authorized to retain twenty-five per cent. of the money paid in by the policyholder, and is also authorized to receive and admit service of process. The policy declares that "The subscribers at the Motor Car Underwriters, herein called exchange, are individuals, firms and corporations that have each executed an agreement (hereby made a part hereof) which vests in the New Jersey Indemnity Company, herein called attorney, power to issue the contract for them. It is understood and agreed that there is assumed by each subscriber, as if a separate contract were issued therefor, a sum which is the same proportion of the aggregate liability hereunder that each

subscriber's advances bear to the aggregate of all subscribers' advances under all contracts in effect at the time of the loss." The policy concludes with an attestation that the subscribers to Motor Car Underwriters at New Jersey Indemnity Exchange have caused these presents to be signed by their attorney, and then follows the signature, "New Jersey Indemnity Company, Attorney-in-Fact, by E. M. Carroll, President." There is nothing in the policy to indicate whether the Motor Car Underwriters at New Jersey Indemnity Exchange is a person, corporation or a partnership.

Without going into greater detail, we regard it as settled that the contract thus put in evidence was a contract of insurance.

A contract exactly like the one in question was considered by this court in *Solomon* v. *New Jersey Indemnity Co.*, 94 N. J. L. 318, and respecting it the court said:

"Looking at all these provisions (in the policy) in a broad way to reach the real intent of the parties and not merely with grammatical, rhetorical, or even legal nicety, although these support the same view, we think *the contract* was meant to be a *contract of insurance by the New Jersey Indemnity Company, acting* not as agent for the subscribers, but *as an insurance company,* in which the subscribers were interested pretty much as stockholders, liable to contribute a certain amount by way of subscription to the liability of the indemnity company from time to time to the extent of a proportionate share of each separate loss as it occurred, and limited to an obligation to pay the proportion of the aggregate liability as set forth in paragraph 'O' of the policy. In this view the New Jersey Indemnity Company is the medium by which each subscriber fulfilled his obligation to indemnify each of his fellow subscribers who suffered a loss, and received from each of his fellow subscribers the indemnity to which he was entitled. The case differs from a Lloyds policy such as was before us in the Enterprise Lumber Company case in that there, each underwriter specified the amount he underwrote; here there must be an ascertainment of each subscriber's proportion of the aggregate liability; to ascertain that propor-

tion there must be some machinery. We can find none provided unless it is the New Jersey Indemnity Company, the insurer, backed by the obligation of the subscriber to put it in funds." And that case was affirmed in the Court of Errors and Appeals February 28th, 1921, on the opinion in the court below.

The defendant, however, insists that, if it is engaged in the insurance business, it is authorized so to do, because, it contends, section 88 does not apply to inter-indemnity or reciprocal insurance of the character in question.

But we cannot yield to that contention.

We think it clear that section 88 of the act was intended by the legislature to reach. and did reach, the kind of the "business of insurance" represented by the contract in question. This view is supported by the title of the act which is "An act to provide for the regulation and incorporation of insurance companies and to regulate the transaction of insurance business in this state." This legislative intent is further evidenced by section 90 in the Revision, which provides:

"The provisions of this act shall not apply to corporations now or hereafter authorized to transact business in this state under the act entitled 'An act relating to assessment insurance,' approved March seventeenth, one thousand eight hundred and ninety-three, nor to corporations provided for in the act entitled 'An act to provide for the incorporation and regulation of life insurance companies on the assessment plan,' approved April twenty-second, one thousand eight hundred and ninety-seven, nor to associations described in the act entitled 'An act regulating fraternal beneficiary societies, orders or associations,' approved March eleventh, one thousand eight hundred and ninety-three."

The general rule is that the exception of a particular thing from the operation of the general words of a statute indicates that in the opinion of the lawmaker the thing excepted would be within the general words had not the exception been made, and the specific naming of those corporations or organizations against whom the provisions of the act were not to apply indi-

cate the legislative intent that it should apply to every person, firm or corporation, and every kind of insurance, except those enumerated in this section of the act.

Moreover, the Insurance act was designed to protect the people of the state against imposition and fraud on the part of insurance companies, no matter what form the particular plan might assume. The intent of the law is that they should be subject to an examination by the insurance commissioner before they could legally write insurance in this state. It imposes certain restrictions on companies or persons desiring to do business in the state, and demands a compliance with certain conditions and the payment of certain fees before a license issues from the proper authority. It contemplates that no agent shall represent any insurance company or aggregation of persons unless the same has been lawfully permitted to do business within the state, and such agent has himself received a certificate entitling him to solicit and write insurance. The inhibition against the unlicensed transaction of insurance business was wisely couched in general terms and applies to the defendant, regardless of its singular method and routine of business, and even though it seems to confine itself to the insurance of motor cars.

Legislation has been enacted in several states authorizing insurance under a reciprocal indemnity plan. In our own state one feature of reciprocal indemnity insurance was recognized by the Lloyds act of 1915 (*Pamph. L., p.* 370), under the provisions of which act an aggregation of persons could combine for the purpose of covering certain hazards, and, after obtaining the authority of the commissioner of banking and insurance, could engage in that line of business, but section 12 of the act provides that "nothing herein contained shall apply to inter-insurers or reciprocal underwriters."

In some of the states the courts have considered attempts. to transact insurance business much like that in the present case.

In the case of *State* v. *Revell, 257 Mo. Rep.* 529, the contract under consideration was very similar to the one under review in the case at bar. The court there said:

"It is perfectly plain from the outline of the business which relator seeks to do as the agent or manager of all persons to whom relator shall issue policies, that it is a state-wide plan with no other requirements as to membership than that the applicant shall insure his property and give the 'manager' the power to do all things, simply by using the name 'manager,' which the member could do himself. The plan provides no guaranty of solvency beyond what may be left of the 'funds payable by a single subscriber' after the subtraction therefrom, by the manager, of his stipulated per cent. and all the costs and expenses which the manager may be put to in carrying on the insurance business."

In the above case the court held that the relator was seeking and intending to do an insurance business without complying with the insurance laws of the state.

In the case of *State* v. *Alley,* 96 *Miss.* 720, the plan comprehended an exchange of contracts between manufacturing lumbermen whereby the mill properties of such manufacturers would be protected against loss from fire. None but manufacturing lumber concerns entered into those contracts. Owing to the number of contracts thus written, the exchange of contracts was accomplished through the medium of an attorney in fact. Each concern entered into contractual relations by executing its separate power of attorney to the attorney in fact. All powers of attorney were to the same effect. For convenience of expression the concerns that entered into these contracts were called "subscribers." The attorney in fact acted under direction of an advisory committee, which committee was selected from among the subscribers and served without pay. (In this respect the present case differs because the attorney in fact is a corporation and has a board of trustees and receives twenty-five per cent. of the premium.) The subscriber paid to the attorney in fact the amount of the premium stipulated in the policy, the rate being fixed in each case at the rate commonly charged for the similar risks by reputable and responsible corporations engaged in the business of writing insurance for profit. In all important respects the nature of the business and the method of doing

business were like those in the case at bar. Mr. Justice Mayes, delivering the opinion of the court, said:

"The state has the unquestioned right to regulate the business of insurance. * * * The question in this case is whether or not this association is doing an 'insurance business' in this state within the meaning of the statutes. There is no question in the case as to the right of any individual to make a contract with the association. The main question here to be considered is whether mere language may be so manipulated as to formulate an adroit plan for the operation of an insurance business in this state in violation of its laws. We say not. It plainly appears that the association is doing an insurance business, and that it has not complied with the insurance laws. The business is therefore declared unlawful, and the association is conducting its business without authority." See also *Filkes* v. *State*, 87 *Miss.* 251.

The cases of *Fort* v. *State* (*Ga.*), 23 *L. R. A.* 86, and *Blanchard & Co.* v. *Hamblin*, 162 *Mo. App.* 242, do not support defendant's contention that its business is not contrary to our statute. In these cases the indemnity insurance was confined to a limited number in a particular line of business, and lacked the features of state-wide dealing with the general public contained in the case at bar. In the present case the defendant was appealing to the public generally in every line of business, the risk it was assuming being the hazards connected with the operation of motor cars. As so-called attorney in fact it issued the policies, received the premium, deducted the twenty-five per cent. due it, and placed the residue of the premiums paid in a reserve fund to meet losses sustained by its "subscribers" and we think was engaged in the insurance business in violation of section 88 of the act.

We think that the enforcement of the penalty does not violate the fourteenth amendment of the constitution of the United States, nor paragraph 1 of article 1 of the constitution of the State of New Jersey. The amendment declares that "no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; * * * nor deny to any person within its jurisdiction the

equal protection of the laws." The purpose and effect of this amendment has been declared to be to protect "against the hostile legislation of the states the privileges and immunities of the citizens of the United States, as distinguished from the privileges and immunities of citizens of the states." *Slaughter House Cases*, 83 *U. S.* 36. And it will be seen that the provisions of our General Insurance act, under which this defendant was convicted, strikes at no privilege of citizens of the United States, as distinguished from the privileges of citizens of New Jersey. The act, therefore, does not violate the fourteenth amendment of the constitution of the United States.

Neither is it a violation of paragraph 1 of article 1 of the constitution of New Jersey, which reads:

"All men are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and of pursuing and obtaining safety and happiness."

The methods by which this right to acquire property is asserted and exercised are subject to regulation by law. Each citizen of a state for the common good must surrender a portion of his personal liberty and rights. The power of government thus brought into service is known as the police power, which it was said in *Boston Beer Co.* v. *Massachusetts*, 97 *U. S.* 25, "extends to the protection of the lives, health and property of the citizens, and to the preservation of good order and the public morals." In *State* v. *Chapman*, 69 *N. J. L.* 464; *affirmed*, 70 *Id.* 339, the court held that "it is within the power of the state, under the police power, to impose, by statute, reasonable restrictions as to registration and the obtaining of a certificate of authority to engage in the practice of dentistry, and to make it a misdemeanor for a person to practice without first obtaining such certificate." And we think that the powers conferred by the act of 1902, under which the defendant was convicted, is a valid exercise of the police power.

The judgment below will be affirmed, with costs.