Essex County Court of Common Pleas.

ROY D. KEEHN, AS RECEIVER OF CENTRAL MUTUAL IN-
SURANCE COMPANY OF CHICAGO, PLAINTIFF, v. HI-
GRADE COAL AND FUEL COMPANY, A CORPORATION
OF NEW JERSEY, DEFENDANT.

Decided February 20, 1945.

For the plaintiff, *Samuel M. Hollander*.

For the defendant, *Kristeller & Zucker (Saul J. Zucker)*.

For the State of New Jersey, *Walter D. Van Riper*, Attorney-General (*Louis J. Cohen*, of counsel), *amicus curiæ*.

HARTSHORNE, C. P. J.   This case poses the interesting question as to whether the recent decision of the United States Supreme Court that the business of insurance is interstate commerce, *United States* v. *South-Eastern Underwriters Association*, 322 *U. S.* 533; 64 *S. Ct.* 1162; rehearing denied October 9th, 1944, 65 *S. Ct.* 26, has rendered invalid,

as applied to insurance companies located outside New Jersey, certain important provisions of that "net-work of legislation" comprising the New Jersey Insurance Law. It is because of this question that the Attorney-General appears as *amicus curiæ*.

The statutory receiver of the Central Mutual Insurance Company of Chicago, a mutual company incorporated in Illinois, which became insolvent, sues defendant to collect an insolvency assessment against him as a member-policyholder. Defendant raises several defenses which plaintiff moves to strike as sham and frivolous. Among the defenses raised, it is asserted that the company, not admitted to do business in New Jersey, has, nevertheless, been doing business in this state without complying with our statutes, and, because of such non-compliance, it cannot recover in our courts. *R. S.* 17:32–10; *N. J. S. A.* 17:32–10. Hence, the question as to the validity of the provisions of the New Jersey law, as affected by the South-Eastern decision, *supra*. We turn to the facts.

On November 1st, 1935, one Scheckner solicited defendant in Irvington, New Jersey, to take one of the company's automobile liability policies covering the defendant's motor vehicles. The defendant signed the formal application which was forwarded to the company, and a policy was issued November 18th, 1935, either in the company's home office in Chicago, or in North Carolina, where the company was authorized to do business. But whether Scheckner solicited the policy on behalf of the company, or was merely looking for insurance prospects on his own account as a broker, is not stated in the affidavits. While this policy, as originally issued, ran for a year from November 7th, 1935, to November 7th, 1936, and charged a premium of $704.76, for the amount of which plaintiff sues, it remained in effect for but three weeks, being canceled with the consent of both parties on December 10th, 1935, the earned premium on such policy, then charged defendant and now paid, being in the amount of $162.09.

The company was found to be insolvent on January 11th, 1937, at which time the plaintiff-receiver was appointed by

the Illinois courts, it having been determined in such proceedings that the company had been insolvent since January 31st, 1935. Thereupon, in accordance with the Illinois statutes, an assessment was levied by the receiver against all who had been member-policyholders from the date of the insolvency to the time of the receiver's appointment, the assessment against defendant being in the above sum of $704.76, the amount of the original premium, not the amount of the earned premium. This assessment was duly confirmed by the Illinois courts, *People, ex rel. Palmer* v. *Central Mutual Insurance Company of Chicago*, 313 *Ill. App.* 84; 39 *N. E. Rep. (2d)* 400. To these proceedings, the defendant, a non-resident, was not in name a party.

The legal effect of such insolvency assessments against the member-policyholders as a class, and of the subsequent proceedings at law against the individual assessees, has been clearly stated in a recent opinion by our Court of Errors and Appeals, *Merola* v. *Fairlawn Newspaper Printing Corp.*, 135 *N. J. Eq.* 152; 36 *Atl. Rep. (2d)* 290. While such proceedings were upon similar assessments for unpaid stock subscriptions of an insolvent corporation, the status of member-policyholders in an insolvent mutual insurance company "is quite like that of stockholders of a corporation whose stock is not fully paid." *Stone* v. *New Jersey and Hudson River Railway Co.,* 75 *N. J. L.* 172; 66 *Atl. Rep.* 1072, 1073; *Pink* v. *A. A. A. Highway Express*, 314 *U. S.* 201-207; 62 *S. Ct.* 241. In the Merola case our highest court lays down the rule in that regard as follows (135 *N. J. Eq.* 152; 36 *Atl. Rep. (2d)* 292):

"It is the general rule that where a corporation has been decreed insolvent, and it has been judicially determined that an assessment against unpaid stock subscriptions is necessary to liquidate the corporate debts, the determination of the insolvency, the necessity, propriety and the *quantum* or the rate of the assessment, are conclusive upon the stockholders in subsequent proceedings against them to enforce the payment of the assessment, even though the stockholder against whom the assessment is sought to be enforced was not made a party to the particular proceeding in which the assessment

was made, and had no personal notice thereof. This is grounded in the principle that a stockholder is so far an integral part of the corporation that, in the view of the law, he is privy to the proceedings touching the body of which he is a member. He is in such privity with the corporation as to be a party to the assessment proceedings through representation by the corporation. Where the assessment is made in a proceeding at the domicile of the corporation to which the corporate body is a party, the propriety and amount of the assessment—matters which concern the entire body of stockholders as a class—are beyond question by the stockholder, but he may interpose all defenses personal to himself in a later action to enforce the assessment. The levy is not a personal judgment against the stockholder, but a judicial determination relative to corporate affairs in which he is represented by the corporation." See to the same effect *McDermott* v. *Woodhouse*, 87 *N. J. Eq.* 615, 618; 101 *Atl. Rep.* 375; *Lincoln Bus Co.* v. *Jersey Mutual, &c., Co.*, 112 *N. J. Eq.* 538, 541; 165 *Atl. Rep.* 112; *People, ex rel. Palmer* v. *Central Mutual Insurance Company of Chicago, supra; Miller* v. *Barnwell Bros., Inc.*, 137 *Fed. Rep.* (*2d*) 257, the latter two cases involving the instant insolvency proceedings against the company here involved.

It follows that the assessment in question against defendant, when confirmed by the decree of the Illinois Court, became a judgment against the member-policyholders of the insurance company as a class, including the defendant, conclusive as to the necessity, propriety and either *quantum* or rate of the assessment, but subject to defenses personal to defendant. Hence, the defenses here raised must now be considered.

*The Validity of the New Jersey Statutes in the Light of the South-Eastern Underwriters Decision.*

As stated above, defendant claims that the company, for whose rights plaintiff is receiver, while not admitted to do business in New Jersey, has, nevertheless, been transacting

business in this state, but without complying with our statutes. Therefore, because it has not "complied with the provisions of" the New Jersey Insurance Law, it is claimed that it cannot "recover in an action in any court in this state * * * for any assessment made upon the policy." *R. S.* 17:32–10; *N. J. S. A.* 17:32–10. Among other things, these statutes require out-of-state insurance companies, in order to transact business in New Jersey, to appoint "agents resident" in New Jersey, subject to exceptions here immaterial (*R. S.* 17:32–11; *N. J. S. A.* 17:32–11), to file with the Department of Banking and Insurance its charter, to satisfy the Commissioner of the propriety of its condition and methods of operation, to constitute him its attorney for the service of process, to obtain his certificate as to such compliance, and not to solicit or negotiate any insurance by itself "or by * * * its * * * brokers, agents, solicitors, surveyors, canvassers, or other representatives," the statutes further requiring brokers who write for any admitted company to be licensed. *R. S.* 17:32–1, 2; *N. J. S. A.* 17:32–1, 2; *Pamph. L.* 1928, *ch.* 221; *N. J. S. A.* 17:17–12; *R. S.* 17:22–1; *N. J. S. A.* 17:22–1. The purpose of these statutes is to "protect the public against imposition which might otherwise be practiced by wholly irresponsible companies." *Columbia Fire Insurance Co.* v. *Kinyon,* 37 *N. J. L.* 33-37; *State* v. *New Jersey Indemnity Co.,* 95 *N. J. L.* 308; 113 *Atl. Rep.* 491. The company has met none of the above requirements.

Defendant here relies on the case of *Cunningham* v. *Brockway Fast Motor Freight, Inc.,* 18 *N. J. Mis. R.* 101; 11 *Atl. Rep.* (2d) 422, and that of *Keehn* v. *Laubach,* 22 *N. J. Mis. R.* 380; 39 *Atl. Rep.* (2d) 73, which relies upon the Cunningham case, as holding that the failure of the insurance companies there involved to comply with these very provisions of the New Jersey Insurance Law, prevented their receivers from recovering on insolvency assessments in proceedings similar to the present. But the Cunningham case was decided at a time when the United States Supreme Court had, by a long line of decisions, *Paul* v. *Virginia,* 8 *Wall.* 163; *New York Life Insurance Co.* v. *Deer Lodge County,* 231 *U. S.* 495; 34 *S. Ct.* 167; *Hooper* v. *California,* 155

*U. S.* 648; 15 *S. Ct.* 207, held that the business of insurance was intrastate, not interstate commerce, and that consequently the state could either exclude an out-of-state company from entering the state at all, or could impose such conditions on its entry as it saw fit. Now, however, by the South-Eastern Underwriters case, *supra*, the United States Supreme Court has overruled this doctrine, and held the business of insurance to be interstate commerce.

The general principle is, of course, well settled, that no state can prohibit the flow of interstate commerce or impede it unreasonably. Indeed, historically, the country's need for such free flow of commerce was the moving cause for the calling of the Constitutional Convention at Philadelphia. Moreover, it has long been deemed to be the law, that a state statute which required a company, engaged in interstate commerce, to take out a license, or forbade its use of the state courts until so licensed, and a resident agent appointed, was unconstitutional, as an unreasonable interference with interstate commerce. *Crutcher* v. *Kentucky,* 141 *U. S.* 47; 11 *S. Ct.* 851; *Sioux Remedy Co.* v. *Cope,* 235 *U. S.* 197; 35 *S. Ct.* 57. Hence, the question as to the present validity of the above provisions of the New Jersey Insurance Law. And here note the very recent decision of the United States Supreme Court in the case of *State Farm Mutual Automobile Insurance Co.* v. *Duel,* 65 *S. Ct.* 573, where the court alludes to substantially the same question as to similar Wisconsin statutes, but does not decide it for purely procedural reasons.

However, while the South-Eastern case does change the previously established doctrine, the court, in that very case, itself intimates that its decision does not "necessarily invalidate many state laws regulating insurance," adding: "It is settled that for constitutional purposes certain activities of a business may be intrastate and, therefore, subject to state control; while other activities of the same business may be interstate and, therefore, subject to federal regulation. And there is a wide range of business and other activities which, though subject to federal regulation, are so intimately related to local welfare that in the absence of congressional action they may be regulated or taxed by the states * * *. And

the fact that particular phases of an interstate business or activity have long been regulated * * * by states has been recognized as a strong reason why, in the continued absence of conflicting congressional action, state regulatory * * * laws should be declared valid." 322 *U. S.* (at *pp.* 548, 549); 64 *S. Ct.* (at *p.* 1171).

Thus, if an out-of-state insurance company, instead of merely accepting an application from a New Jersey resident in Illinois and writing its policy there, and thereafter mailing it to the resident, actually does business in New Jersey, by having a representative solicit such policy, procure same, obtain payment of the premium and, perchance, as well inspect and supervise the property covered, all within the State of New Jersey, it would seem that these acts are all intrastate activities, "and therefore subject to state control." Further, since these acts are also "intimately related to local welfare," in that, if the company is irresponsible, a fraud would be perpetrated upon New Jersey citizens in taking the premium (*Columbia Fire Insurance Co.* v. *Kinyon, supra*), it would seem that such acts "may be regulated * * * by the states," particularly in view of the present "absence of congressional action" in regard to the regulation of insurance, all in accordance with the rule enunciated by the court in its far-reaching decision in the South-Eastern case.

Nor, for like reason, is the state requirement of a certificate of admission for out-of-state companies, equivalent, though it be, to a license, subject to question. For, the United States Supreme Court has substantially departed from its previous view in that regard, by recently holding, even previous to its South-Eastern decision, that a corporation, engaged in foreign commerce, which, under the constitution, is protected from state interference on an exact equality with interstate commerce (United States Constitution, article I, section 8, clause 3), may be required to take out a state certificate of compliance with conditions substantially similar to the New Jersey provisions. *Union Brokerage Co.* v. *Jensen,* 322 *U. S.* 202; 64 *S. Ct.* 967. The court there says, "In the absence of applicable federal regulation the state may impose nondiscriminatory regulations on those engaged in foreign com-

merce 'for the purpose of insuring the public safety and convenience' * * *. The commerce clause does not deprive Minnesota of the power to protect the special interest that has been brought into play by Union's localized pursuit of its share in the comprehensive process of foreign commerce." See in accord *Milk Control Board* v. *Eisenberg Farm Products,* 306 *U. S.* 346; 59 *S. Ct.* 528; 83 *L. Ed.* 752; *California* v. *Thompson,* 313 *U. S.* 109; 61 *S. Ct.* 930; 85 *L. Ed.* 1219.

In short, the fact that the business of insurance, as now conducted throughout the country, is to be deemed interstate commerce, would not, in the absence of conflicting congressional action, seem to invalidate, as to out-of-date companies doing business in New Jersey, such non-discriminatory provisions of the New Jersey Insurance Laws, as are reasonably requisite to protect New Jersey citizens.

No contention having been made that the above statutes are discriminatory against out-of-state companies, the next question is whether the company here was doing business in fact within New Jersey. For, the crux of the state's jurisdiction is whether or not the company was in truth within both the protective and regulative power of the state. *Hoopeston Canning Co.* v. *Cullen,* 318 *U. S.* 313; 63 *S. Ct.* 602; *United States* v. *South-Eastern Underwriters, supra; Union Brokerage Co.* v. *Jensen, supra; Parker* v. *Brown,* 317 *U. S.* 341; 63 *S. Ct.* 307; 87 *L. Ed.* 315.

But this question as to whether or not an out-of-state company is doing business in New Jersey is not to be decided simply by ascertaining where the contract was technically completed, nor by whether the individual who took the insured's application was popularly known as a broker. "In determining whether insurance business is done within a state for the purpose of deciding whether a state has power to regulate the business, considerations of the location of the activity prior and subsequent to the making of the contract, *Osborn* v. *Ozlin,* 310 *U. S.* 53; 60 *S. Ct.* 758, of the degree of interest of the regulating state in the object insured and of the location of the property insured, are separately and collectively of great weight." *Hoopeston Canning Co.* v. *Cullen,*

*supra.* Previously, if the insurance contract were completed out of the state, that was often deemed decisive as to the fact that the company was not doing business within the state. *Allgeyer* v. *Louisiana,* 165 *U. S.* 578; 17 *S. Ct.* 427. But it should be noted that in that case no broker was employed within the state, no premium paid there, nothing, in fact, done within the state, except that the resident insured mailed a notice to a broker outside the state. Indeed, serious doubts have recently been cast upon the correctness of the Allgeyer decision. *Osborn* v. *Ozlin, supra; Hoopeston Canning Co.* v. *Cullen, supra.* Nor is the fact determinative that a broker is generally considered the agent of the insured, not the company. 137 *A. L. R.* 1133. For such broker may, though a broker in name, be acting on behalf of the company in fact, and if this occurs in other than a single, isolated transaction, the out-of-state insurer may be "doing business" within such state. 137 *A. L. R.* 1134. *Columbia Insurance Co.* v. *Kinyon, supra.* It is the facts as a whole that count. If, though a licensed broker, the individual solicits insurance for the company, not from the company, and collects premiums for it, not on behalf of the insured, the broker becomes the agent of the company in fact, and this fact, if in question, "is to be determined by the jury." *Higgins* v. *Fidelity Finance Insurance Co.,* 107 *N. J. L.* 175; 151 *Atl. Rep.* 869, 870; *Smith and Wallace Co.* v. *Prussian Insurance Co.,* 68 *N. J. L.* 674; 54 *Atl. Rep.* 458.

Unfortunately the pleadings and supporting affidavits in the cause, upon which alone the determination of this question must presently be based, leave this very fact, and the similar congeries of evidence above alluded to, an open question. Of course, the mere claim of counsel, that Scheckner was not acting for the company, can no more be now considered, than can the fact found by the court in *Keehn* v. *Laubach, supra,* that the very company here involved at that time was employing brokers to solicit insurance policies for it, and was therefore doing business within New Jersey. Indeed, it might here be noted, that not only in such case, but in *Cunningham* v. *Brockway, supra,* and in *Bothwell* v. *Buckbee-Mears Co.,* 275 *U. S.* 274; 48 *S. Ct.* 124, on which the court

in the Cunningham case relies, the companies were found to be doing business within the state by "sending a representative into the state who solicited the insurance there," *Cunningham* v. *Brockway, supra;* 18 *N. J. Mis. R.* 109; 11 *Atl. Rep.* (2*d*) 426, referring to *Bothwell* v. *Buckbee-Mears Co., supra,* a situation which may or may not exist here, according to the present pleadings and affidavits. While the determination of this question, as to whether the company here had been doing business in New Jersey and so should have complied with the above provisions of the New Jersey statutes, must thus be reserved for the production of further proof, either at or before the trial, we proceed to the consideration of the further questions of law involved, since all concerned have properly presented such questions for determination now, rather than during the haste of trial.

Nor will the enforcement of the New Jersey act (*R. S.* 17:32–10; *N. J. S. A.* 17:32–10), in denying plaintiff the right to recover in the New Jersey courts, for its failure to comply with the New Jersey statutes covering the company's doing business within the state, in any way violate the full faith and credit clause of the United States Constitution (article 4, section 1). For, the full faith and credit clause simply requires the local state (New Jersey), subject to certain implied exceptions, to give exactly the same faith and credit in its courts, which the foreign state, Illinois, gives the judgment in question in its courts. And the Illinois statutory receivership is but a class jugment, binding in Illinois, and New Jersey as well, upon the member-policyholders, only as to the necessity, propriety and either the *quantum* or rate of assessment, but in nowise to be considered as a judgment *in personam* against defendant or any other member-policyholder. *Merola* v. *Fairlawn Newspaper Printing Corp., supra.* Indeed, since the defendant was not, as a non-resident, served as a party in such class proceedings, he could not constitutionally be bound personally thereby. *Pennoyer* v. *Neff,* 95 *U. S.* 714. Thus, if the present suit were instituted in Illinois, with the present defendant properly served as a party thereto, he would there be at full liberty to raise all defenses personal to him and not open to the member-policy-

holders as a class. Of course, the fact that the company has not .been properly admitted in New Jersey is a defense personal to defendant in New Jersey, but utterly unavailable to all policyholder-defendants outside New Jersey.

Nor is *Broderick* v. *Rosner*, 294 *U. S.* 629; 55 *S. Ct.* 589, to the contrary. There the holding was simply to the effect that New Jersey's denial of any practicable remedy at all, to collect an insolvency assessment, ran counter to the full faith and credit clause. Here the New Jersey statutes deny no remedy to any company, except one which has refused to protect New Jersey citizens properly from fraud and imposition, a matter of the proper exercise of the police power, in nowise involved in the Broderick case. And see *State Farm Mutual Automobile Insurance Co.* v. *Duel, supra.*

### *The Maximum Premium Was Expressed in the Policy.*

The New Jersey statutes require the maximum premium to be "expressed in the policy * * *" (*R. S.* 17:28–3; *N. J. S. A.* 17:28–3), and defendant claims the policy in question does not so provide.

But the policy does provide that the insured becomes a member of the company and agrees that "the contingent liability of the assured hereunder is limited to one time the premium named herein and no more." This is one of the "general conditions" of the policy, which further provides that "this automobile policy is issued * * * subject to the printed conditions of the policy." Thus, the original premium stated on page 1 of the policy, plus the above statement as to the limited "contingent liability," clearly "express the maximum premium," for which the assured can under any circumstances become liable.

Of course, the amount of the ultimate premium could not possibly be expressed in the policy. For the amount of this contingent premium could not be determined at the time the policy was written, but only long thereafter when the company had been found to be insolvent, forcing the assessment, itself this "contingent liability." In any event, the statute

does not require the policy to express this ultimate premium, but only to express the "maximum premium," which it does to the utmost possible extent. Since the decision, apparently to the contrary, in *Keehn* v. *Parrish Dray Line*, 53 *Fed. Supp.* 855, has recently been reversed (145 *Fed. Rep.* (*2d*) 646), it not only is not to the contrary, but accords with the view of this court, and this regardless of the fact that the policy there in question required the statement of the "total premium," *i. e.,* a more specific term than the "maximum premium" as here.

### The Statute of Limitations Is Not a Bar.

Defendant urges that the six-year statute of limitations bars the suit, on the theory that the suit is upon the insurance policy-contract issued in 1935, more than six years before the institution of this suit in March, 1944. But defendant misconceives the gravamen of the cause of action. The suit is not on the policy, but on the judgment or decree of the Illinois court, confirming the class assessment made by the receiver in the above Illinois insolvency proceedings. *McDermott* v. *Woodhouse, supra; Scovil* v. *Thayer,* 105 *U. S.* 143; *Glenn* v. *Marbury,* 145 *Id.* 499; 12 *S. Ct.* 914; *Shipman* v. *Treadwell,* 208 *N. Y.* 404, 411; 102 *N. E. Rep.* 634. This Illinois decree confirming the assessment was entered March 19th, 1940, less than six years before the institution of the suit.

### Plaintiff's Recovery, If Any.

Plaintiff sues for $704.76, the amount equal to the premium written into the policy before its cancellation, not for the amount equal to the premium which was actually earned on cancellation, to wit $162.09. In short, assuming the plaintiff recovers at all, is he entitled to recover an amount equal to the premium which was canceled by mutual agreement between the company and the assured, or to an amount equal to that which the company earned and the insured paid?

The answer to this, of course, depends upon the terms

of the policy contract and the effect of the cancellation of the policy, including the charge of the "short-rate" earned premium.

The policy provided that "The contingent liability of the assured hereunder is limited to one time the premium named herein and no more." It is this "contingent liability of the assured," with which we are now concerned. For the assured, as a member of this mutual company, became a co-insurer with the other insured policyholders and thus became responsible for the company's losses in excess of its receipts. It was this excess of losses over receipts which made the company insolvent, caused the appointment of the present plaintiff as its receiver, and justified the assessment of this excess against the policyholders as a class. The question is whether, in assessing defendant, he should be assessed upon the basis of his policy contract as originally written, or upon the basis of his policy contract as it was ultimately carried out.

We, therefore, turn to the consideration of the effect of the cancellation by both parties of the original policy contract. When an issued policy is canceled "short rate," what occurs, legally speaking, is its mutual rescission by both the company and the insured, and the re-issue of a new policy contract, identic in all respects with the original, save for the shortened term and the lessened earned premium. This latter contract is substituted for the original. Hence, the above condition, as to limiting "the contingent liability of the insured" to "one time the premium named herein;" refers to the premium named, not in the original, but in the substituted policy. It refers, in short, to the earned premium, here $162.99. Indeed, in *Miller* v. *Barnwell Bros.,* 137 *Fed. Rep.* (2d) 257, 260, involving a policy contract identic with that here, issued by this very company and involving these very Illinois insolvency proceedings and this very plaintiff receiver, "The receiver concedes that his recovery is limited to an amount equal to the premiums earned." In other words, when plaintiff here sued on a policy the same as that here, he conceded that, as to the canceled policy involved in that case, the assessment was limited to the premium earned from the date of issue to the date of cancellation. And this concession by the

present plaintiff accords not only with reason but with authority. For, in the similar insolvency proceedings against a mutual insurance company, dealt with in the case of *Lincoln Bus Co.* v. *Jersey Mutual Insurance Co., supra,* the court, both expressly and in its mathematical tabulation, holds that it is the "earned premiums," which constitute the basis of the receiver's assets. 112 *N. J. Eq.* 538-541; 165 *Atl. Rep.* 112.

The motion to strike defendant's answer and its first and second separate defenses will be denied. The motion to strike the third, fourth and fifth separate defenses is granted.