## Gulf States Creosoting Co. *v.* Southern Finance & Construction Corporation *et al.*

(Division B. March 27, 1933. Suggestion of Error Overruled May 8, 1933.)

[146 So. 860. No. 30095.]

Hannah & Simrall, of Hattiesburg, **Welch & Cooper**, of Laurel, **W. Leon Smith**, of Blytheville, Arkansas, **Bozeman & Cameron**, of Meridian, and **Currie & Currie**, of Hattiesburg, for appellant.

716

Baskin, Wilbourn & Miller, and Geo. B. Neville, all of Meridian, for appellees.

718

720

Argued orally by **T. C. Hannah, Ellis B. Cooper** and **E. J. Currie**, for appellants, and by **R. E. Wilbourn**, for appellees.

**Ethridge, P. J.**, delivered the opinion of the court.

In January, 1919, the Meridian & Bigbee River Railway Company was incorporated under the laws of the state of Mississippi, but remained inactive and practically a paper corporation until the latter part of the year 1926. The capital stock of the corporation was one thousand shares, of which nine hundred and ninety-eight shares were owned by S. A. Neville, who later transferred same to his son, G. N. Neville, without the payment of any money, so that the said S. A. Neville could organize and operate the Southern Finance & Construction Company which he did, and on December 24, 1926, a contract was signed between the Meridian & Bigbee River Railway Company on the one hand and the Southern Finance & Construction Company on the other hand, whereby the latter agreed to furnish the materials and perform the labor necessary to build a railroad to be known as the Meridian & Bigbee River Railway Company, the capital stock of said Southern Finance & Construction Company consisting of twelve thousand dollars in cash, and some secondhand machinery and equipment valued at eighty-

eight thousand dollars. On December 4, 1926, and apparently before the contract had been signed between the Meridian & Bigbee River Railway Company and the Southern Finance & Construction Corporation, the latter entered into a written agreement with J. A. Perdue & Co. for the construction. The record shows, however, that, while this contract was dated December 4, 1926, it was not completed then, but was consummated later.

On January 13, 1927, a contract was negotiated by Mr. Neville on behalf of the Meridian & Bigbee Railway Company with the Y. & M. V. R. R. Company for the lease of certain rails and equipment, being merely a lease for equipment which could be removed by the Y. & M. V. R. R. Company at its option.

On February 1, 1927, the Southern Finance & Construction Company negotiated with the Gulf States Creosoting Company for certain materials to be used in the construction of the line of railroad, and on March 22, 1927, and April 7, 1927, sent the Gulf States Creosoting Company orders for material needed.

On April 5, 1927, the Southern Finance & Construction Company borrowed one hundred thousand dollars from certain banks and individuals in Meridian, Mississippi, to be used in the construction of the railroad, and executed what is known as a trust agreement, joined in by S. A. Neville and the Meridian & Bigbee River Railway Company, whereby the proceeds of the construction contract were undertaken to be assigned to the First National Bank of Meridian, as trustee. On June 1, 1927, a second trust agreement was executed between the same parties undertaking to make a further assignment of the construction contract aforesaid to secure an additional advance of money. During the month of June, 1927, there was certain correspondence between S. A. Neville, president of the Southern Finance & Construction Company, and the Gulf States Creosoting Company, confirming orders and understandings in reference to ma-

terials ordered by the Meridian & Bigbee River Railway Company; and on July 6, 1927, the president of the Gulf States Creosoting Company further amplified the understanding about purchase of material.

On December 17, 1927, there was a third trust agreement between the same parties undertaking to assign and transfer the proceeds of the construction contract for the purpose of securing additional advances to construct the railroad track; and on March 23, 1928, a fourth trust agreement was entered into undertaking to transfer and assign the proceeds of the construction contract to secure additional advances in the amount of two hundred thousand dollars.

On October 10, 1928, J. A. Perdue & Co. gave notice to the Meridian & Bigbee River Railway Company of the amount due to said Perdue & Co. by the Southern Finance & Construction Company, and stating that Perdue & Co. would claim the benefit of the mechanics' and materialmen's lien statutes; and, on October 28, 1928, Perdue & Co. filed suit in the circuit court of Lauderdale county, Mississippi, against the Southern Finance & Construction Company, the Meridian & Bigbee River Railway Company, and the First National Bank of Meridian, as trustee, for the purpose of collecting the indebtedness due by the Southern Finance & Construction Company to J. A. Perdue & Co., and to enforce the mechanics' and materialmen's lien of Perdue & Co. against the railroad. However, other parties furnishing material and labor in the construction of the railroad were not made parties to this suit, nor was there any proceeding suggesting that similar parties had claims and that they be made parties to the suit.

On September 25, 1929, a fifth trust agreement was entered into by the same parties for the purpose of further additionally securing the indebtedness due by the Southern Finance & Construction Company and the Railroad Company to the trustee.

On December 27, 1929, the Interstate Commerce Commission made its report and order authorizing the Meridian & Bigbee River Railway Company, to issue its common stock of the par value not exceeding two hundred thousand dollars and its bonds in the amount of five hundred thousand dollars, the proceeds to be used in paying for the construction of the said railroad; and on December 31, 1929, the Gulf States Creosoting Company filed its original bill in the chancery court of Lauderdale county, making defendants thereto the Southern Finance & Construction Company, the Meridian & Bigbee River Railway Company, the First National Bank of Meridian, and the various and sundry beneficiaries under the trust agreements hereinbefore referred to. This bill was filed for the purpose of collecting the balance due for material sold to the Southern Finance & Construction Company, and for the purpose of enforcing a lien created by the mechanics' and materialmen's lien statutes of Mississippi, and also for the purpose of having declared invalid the assignments of the proceeds of the construction contract, under the trust agreements above referred to. Various other parties claiming materialmen's liens and J. A. Perdue & Co. were brought into this suit, and each of their respective rights were fully and elaborately set forth in the pleadings. The exhibits filed with the pleadings were so voluminous, it is a matter of some difficulty to concisely state the full contentions in all the respective pleadings.

However, it appears to be alleged and admitted that the Southern Finance & Construction Company, hereinafter to be called the construction company, and the Meridian & Bigbee River Railway Company, hereinafter to be called the railroad company, entered into a written contract by the terms of which the construction company was to furnish labor and material to build a railroad; that the Gulf States Creosoting Company sold and delivered material to the construction company, which was

used in the construction of the railroad, and for which the construction company owed the creosoting company the sum of one hundred seven thousand five hundred ninety-four dollars and eighty-six cents at the time the suit was filed; that the materials were used in the building of said railroad, and the railroad company accepted it from the construction company knowing that this material had not been paid for, and that the construction company could not pay for same until the railroad company paid the construction company.

It further appears that J. A. Perdue Company furnished material and labor in the construction of the railroad, and that the construction company was indebted to J. A. Perdue Company in the sum of seventy-two thousand seven hundred twelve dollars and two cents. It further appears that, at the time of the filing of this suit, the railroad company had not paid the construction company anything whatever on account of material furnished or labor performed, but, on the contrary, owed the amount covered by the contract, to-wit, approximately seven hundred thousand dollars, and had undertaken to join in with the Southern Finance & Construction Company in the trust agreements, and, by said trust agreements, to hypothecate the capital stock and bonds above referred to, to parties who had furnished money to the construction company which had been used in part payment for materials and construction work in the building of said railroad.

It appears that there were outstanding claims by materialmen and laborers, some aggregating from two hundred twenty-five thousand to two hundred fifty thousand dollars; and that, under the trust agreements, there was due by the construction company the sum of four hundred thousand or four hundred fifty thousand dollars.

It was contended by the appellants and other parties furnishing material for construction of the railroad that the undertaking to assign and transfer the proceeds of

the construction contract is absolutely void in so far as the appellants and other complainants are concerned, and that the rights of the beneficiaries and trustees are subordinated to the rights of the complainants, appellants here.

The appellees contend that these assignments are valid, and that they should have priority under the trust agreements to the proceeds of the stock and bonds hereinbefore referred to.

The complainants below, appellants here, charge that they are entitled to the proceeds of the construction contract, and to the benefit and protection of the subcontractors and materialmen's lien under the Mississippi statutes, which claims are denied by the appellees, they contending that the complainants, appellants here, are not entitled to the benefit of the materialmen's lien, even though same was authorized by the Mississippi statutes, because notice was not served within twelve months from the time the indebtedness became due. It is also claimed that notice given by J. A. Perdue & Co. was not a sufficient notice under the statute, conceding the statute to be applicable, in that it did not give notice of the amount of the claim, nor cite any statute involved in its notice.

The contention of the appellees is that the railroad company is an interstate railroad engaged in interstate commerce, and that the Mississippi statutes did not apply to such railroads, in that, if it is construed to apply to such railroads, then it is in conflict with the Federal Transportation Act and the Constitution of the United States. Appellee further contends that the Federal Transportation Act of 1920 (amending Interstate Commerce Act), section 20a thereof (49 U. S. C. A., section 20a), has superseded and supplanted the mechanics' and materialmen's lien in so far as it applies to interstate railroads; that the complainants failed to comply with chapter 136, Laws 1928, with reference to filing and recording in the office of the chancery clerk its claim lien.

The construction company, one of the defendants in the suit, did not file an answer, or in any manner contest the rights of the complainants, and a decree pro confesso was entered against this defendant.

It appears that during the negotiations between the construction company, the railroad company, and parties to the trust agreements who were furnishing money to the construction company under the trust agreements referred to, certain of the parties connected with Perdue & Co. and the Gulf States Creosoting Company were present during the discussions, and that there were certain waivers of time made for the assertion of their rights in the matter, which will be referred to in the discussion of the case hereafter.

The chancellor decided the issue in favor of the appellees, rendering an opinion setting forth his views at some length, in which he held that, if the subcontractors' and materialmen's lien applied to interstate railroads, then the appellants in this case had taken the necessary steps to entitle them to the benefit of this statute; but further held that said subcontractors' and materialmen's lien had no application in this case, because it was not the intention of the Legislature to extend said statute to interstate railroads, and that it would be a violation of the federal interstate commerce statutes to so apply such lien statutes.

The Mississippi statute relied on is chapter 128, Laws 1918, which has been brought forward into the Code of 1930 as sections 2274 to 2281. The first section of chapter 128, Laws 1918, amending section 3074, Code 1906, reads as follows:

"When any contractor or master workman shall not pay any person who may have furnished materials used in the erection, construction, alteration, or repair of any house, building, structure, fixture, boat, water craft, railroad, railroad embankment, or the amount due by him, to any subcontractor therein, or the wages of any jour-

neyman or laborer employed by him therein, any such person, subcontractor, journeyman or laborer may give notice in writing to the owner thereof of the amount due him and claim the benefit of this section; and, thereupon the amount that may be due upon the date of the service of such notice by such owner to the contractor or master workman, shall be bound in the hands of such owner for the payment in full, or if insufficient then pro rata, of all sums due such person, subcontractors, journeymen and laborers, who might lawfully have given notice to said owner hereunder, and, if after such notice, the contractor or master workmen shall bring suit against the owner, the latter may pay into court, the amount due on the contract; and thereupon all persons entitled hereunder, so far as known, shall be made parties and summoned into court to protect their rights, contest the demands of such contractor or master workmen and the other claimants; and the court shall cause an issue to be made up and tried and direct the payment of the amount found due in accordance with the provisions hereof; or in case any person entitled to the benefits hereof, shall sue the contractor or master workman, such person so suing shall make the owner and all other persons interested, either as contractors, master workmen, subcontractors, laborers, journeymen or materialmen, so far as known, parties to the suit (and any such party if not made a party in any suit hereunder authorized may intervene by petition), and, thereupon the owner may pay into the court the amount admitted to be due on the contract or sufficient to pay the sums claimed, and the court shall cause an issue to be made up and award the same to the person lawfully entitled; in either case the owner shall not be liable for costs; but if the owner, when sued, with the contractor or master workman, shall deny any indebtedness sufficient to satisfy the sums claimed and all costs, the court shall, at the instance of any party interested, cause an issue to be made up to

ascertain the true amount of such indebtedness and shall give judgment and award costs according to the rights of the several parties in accordance herewith. In case judgment shall be given against such owner, such judgment shall be a lien, from the date of the original notice, and shall be enforced as other liens provided in this chapter. The owner shall not be liable in any event for a greater amount than the amount contracted for with the contractor.''

Section 2 of this act reads as follows: ''No contractor or master workman except as hereinafter provided, shall have the right to assign, transfer, or otherwise dispose of in any way the contract or the proceeds thereof, to the detriment or prejudice of the subcontractors, journeymen, laborers and materialmen as declared hereinbefore, and all such assignments, transfers, or dispositions shall be subordinate to the said rights of the subcontractors, journeymen, laborers and materialmen, as well as the owner. Provided, however, that this section shall not apply to any contract or agreement where the contractor or the master workman shall enter into a solvent bond conditioned as provided for in section 3 hereof.''

We think the chancellor was in error in holding that section 1 of chapter 128, Laws of 1918, section 2274, Code of 1930, did not apply to a railroad which ran from one state to another, and that, if it did apply, it was in conflict with section 20a of the Transportation Act of 1920, and other provisions of the Interstate Commerce Act. It will be noted that chapter 128, Laws 1918, was passed before section 20a of the Transportation Act of 1920 was enacted, and, at the time of the passage of the state law, it was clearly permissible for a state to impose a lien upon a railroad or railroad embankment in favor of a contractor, or subcontractor, journeyman, or laborer. The language of section 1 of the state act clearly shows that it was the purpose of the Legislature to impose the rights fixed thereby in favor of subcontractors, journey-

men, laborers, etc., upon railroads and railroad embankments, whether engaged in interstate commerce or not.

If the Transportation Act of 1920 should prohibit such liens being attached, or such rights being enforced, the state law would be merely suspended during the existence of the federal statute. We do not understand, however, from the federal decisions, some of which will be referred to hereinafter, that the federal act has the effect attributed to it. We do not see that there is any distinction between the power of the state to impose a lien upon a railroad structure or embankment in favor of a contractor, subcontractor, journeyman, or laborer for work done on a railroad situated wholly within the state, or what the state could do to a railroad running from this state into another state. As we understand the federal authorities, the Transportation Act, where applicable, applies to railroads doing interstate business, although it is wholly within the limits of the state. In such case, freight and passengers are transported from a point in one state into another. In other words, the test of interstate business is the origin and destination of passengers and freight, as the case may be, and not the line of railroad, or the particular boat or train. All railroads are, in fact, engaged in interstate commerce.

We have construed chapter 128, Laws 1918, in a number of cases, and its effect is already established, where applicable, by these decisions, which will be merely referred to. McLendon v. Indianola Lbr. Co., 128 Miss. 265, 90 So. 885; Citizens' Lbr. Co. v. Netterville, 137 Miss. 310, 102 So. 178; Dickson v. U. S. F. & G. Co., 150 Miss. 865, 117 So. 245; Hartford Accident & Indemnity Co. v. Natchez Investment Co., 155 Miss. 31, 119 So. 366; United States F. & G. Co. v. Parsons, 154 Miss. 587, 122 So. 544; American Oil Co. v. Ratliff's Sheet Metal Works, 155 Miss. 779, 125 So. 249; White's Lumber & Supply Co. v.

Rea, 158 Miss. 695, 131 So. 259; Davis Co. v. D'Lo Guaranty Bank, 162 Miss. 829, 138 So. 802.

Section 2 of chapter 128, Laws 1918, provides that, where a bond is given, this section does not apply.

We think, therefore, that the rights of the appellants were prior to the rights of the appellees; and, unless the chancery court shall find from the evidence that such rights were waived in favor of the appellees, or some of them, the court should render a judgment for the appellants for the amount due them, on a remand of the case.

It is true that a railroad cannot be constructed, which is to engage in interstate business, without getting a certificate, under the Transportation Act (Interstate Commerce Act, section 1 [49 U. S. C. A., section 1]), from the Interstate Commerce Commission, and that, in order to get this certificate, it must satisfy the Commission of the necessity and get its approval to construct the road, informing it of the expense necessary to construct it, and the debts, with securities, to be contracted. This was done in the case before us. The stock and bonds were authorized to be sold at a given amount for the purpose of building the railroad, which securities were required to bring at least par when sold.

The appellees rely upon the decision in the case of Alabama & Vicksburg Ry. Co. v. Jackson & Eastern Ry. Co., 271 U. S. 244, 46 S. Ct. 535, 537, 70 L. Ed. 928, where the court used language which, if taken alone, would apparently support the judgment of the court below and the contention of the appellees. In that case the court held that: "It is true that in this case the state court found that the place selected for the junction was a proper one. But the power to make the determination whether state action will obstruct interstate commerce inheres in the United States as an incident of its power to regulate such commerce. Compare Colorado v. United States, 271 U. S. 153, 46 S. Ct. 452, 70 L. Ed. 878. In matters relating to the construction, equipment, adapta-

tion and use of interstate railroad lines, with the exceptions specifically set forth in paragraph 22 [49 U. S. C. A., section 1, paragraph 22], Congress has vested in the Commission the authority to find the facts and thereon to exercise the necessary judgment.''

In the case of Missouri-Kansas-Texas R. R. Co. v. Mars, 278 U. S. 258, 49 S. Ct. 103, 73 L. Ed. 316, the court had before it the question of liability imposed by section 6625 of the Texas Revised Civil Statutes 1911, which provided that: ''In case of a sale of the property and franchises of a railroad company within this state the purchaser . . . and associates, . . . may form a corporation . . . for the purpose of acquiring, owning, maintaining and operating the road so purchased . . . ; and, when such charter has been filed, the new corporation shall have the powers and privileges then conferred by the laws of this state upon chartered railroads. . . . The property and franchises so purchased [260] shall be charged with and subject to the payment of all subsisting liabilities and claims for death and personal injuries . . . for loss of and damage to the property sustained in the operation of the railroad by the sold out company . . . and for the current expenses of such operation.''

It was contended that this statute was invalid and in conflict with the provisions of section 20a of the Transportation Act of 1920 (amending Interstate Commerce Act), in paragraph 2 (49 U. S. C. A., section 20a, paragraph 2) of which it is provided that: ''It shall be unlawful for any carrier to issue any share of capital stock or any bond or other evidence of interest in or indebtedness of the carrier . . . or to assume any obligation or liability . . . in respect of the securities of any other person . . . even though permitted by the authority creating the carrier corporation, unless and until, and then only to the extent that . . . the [interstate

commerce] commission by order authorizes such issue or assumption.''

The court there said that the ''plaintiff in error does not contend that the claim of the defendant in error is not covered by the terms of article 6625, or that, considered without regard of section 20a, it would not be effective to charge the property. The purpose of that article is to subject the property of the railroad to payment of claims of the classes specified and to prevent their defeat by a transfer of the property. And clearly section 20a relates exclusively to securities. It regulates those to be issued by the carrier and its assumption of liability or obligation in respect of those issued by others. And it declares the consequences to follow violations of the requirements prescribed. It does not, in any manner, relate to liability for, or the payment of, claims specified in article 6625. Its field of operation is wholly distinct from that covered by the state enactment. It requires no discussion or citation of authority to show that there is no conflict between article 6625 and the provisions of section 20a of the Transportation Act referred to. The contention of plaintiff in error is without merit.''

In the case at bar, the Interstate Commerce Commission had approved the construction of the railroad. It did not prescribe, and the statute does not prescribe, for securities of the contractor and laborers in the construction of the work, and in furnishing the materials for the construction of depots and other accessories. We think the regulation of these matters is left with the state.

In the case of Interstate Commerce Commission v. Los Angeles, 280 U. S. 52, 50 S. Ct. 53, 74 L. Ed. 163, it was held: ''No authority in the Interstate Commerce Commission to require the building of a union passenger station can be inferred from the provisions of the Interstate Commerce Act as amended by the Transportation Act of 1920, empowering the Commission to require by

order any carrier subject to the act to provide itself with safe and adequate facilities for performing as a common carrier its car service and to extend its line; that carriers shall afford all reasonable, proper and equal facilities for the interchange of traffic and for the receiving, forwarding and delivering of passengers or property to and from their several lines; and that the Commission may require the use of the terminal facilities of any carrier by other carriers on such terms or for such compensation as the carriers affected may agree upon, or, in the event of a failure to agree, as the Commission may deem just and reasonable.''

In the case of Railroad Commission of State of California v. So. Pac. R. R. Co., and other cases, reported in 264 U. S. 331, 44 S. Ct. 376, 68 L. Ed. 713, quoted from in Interstate Commerce Commission v. Los Angeles, 280 U. S. 52, 50 S. Ct. 53, 74 L. Ed. 163, the court said: ''Authority over the establishment by railroad companies of union stations in cities by a new construction involving extension of main lines and abandonment of main tracks and terminals, is vested in the Interstate Commerce Commission to the exclusion of state commissions by the provisions of section 402 of the Transportation Act [see 49 U. S. C. A., section 1], that no interstate carrier shall undertake the extension of its line, or abandon all, or any portion of it, without a certificate by the Interstate Commerce Commission of public convenience.''

On page 378 of 44 S. Ct., 264 U. S. 331, 68 L. Ed. 718, it is said: ''But it is insisted that the supervisory power thus conferred does not include the installation of an interstate union station, where its terminals and main tracks are newly built, and the interstate carriers are compelled to expropriate, not the terminal property of another interstate carrier, but property of others than carriers not theretofore used for terminals. This would be giving power to the Interstate Commerce Commission to provide for a small and contracted union station of

interstate carriers, limited to the terminals of one carrier, and would leave the larger and more important union stations of interstate carriers to the control of state commissions."

In the case of Los Angeles & Salt Lake R. R. Co. v. Railroad Commission, 283 U. S. 380, 51 S. Ct. 553, 75 L. Ed. 1128, the court again had before it the question of the establishment of a union depot, and held that the "authority of a state railroad commission to require the building of a union station by interstate carriers has not been abrogated by congressional occupation of the field except to the extent that the approval by the Interstate Commerce Commission of the necessary relocation of tracks is required.

"Congress may circumscribe its regulation of matters as to which the states have concurrent power, and occupy a limited field; and the intention to supersede the exercise by the state of its authority as to matters not covered by the Federal legislation is not to be implied unless the act of Congress, fairly interpreted, is in conflict with the law of the state."

In the course of the opinion the court said that: "The questions presented are solely those of constitutional authority. All questions of fact as to public convenience and necessity, and as to the practicability of the proposed plan, have been resolved against the railway companies by the proper tribunals. This court has held that the state commission could not require the construction of the proposed station, and the relocation of connecting tracks, without the approval of the Interstate Commerce Commission. That approval has been given. This court has also decided that the Interstate Commerce Commission has not been empowered to require the building of the station. That commission has not attempted to exercise any such authority. The question now is as to the authority of the state commission, in view of the action of the federal commission, to require the

construction of the station with the incidental arrangement of tracks and facilities. The decision of the state court [209 Cal. 460, 288 Pac. 775] is conclusive so far as the constitution and laws of the state are concerned. The state commission has acted within the power conferred upon it. The only questions before us are those arising under the federal constitution and the Interstate Commerce Act. . . . The considerations which led the court to the conclusion that the power to compel the construction of such terminals had been withheld from the federal commission also make it clear that the authority which resided in the state had not been taken away except to the extent that the approval of the federal commission was required. The principle thus applicable has been frequently stated. It is that the Congress may circumscribe its regulation and occupy a limited field, and that the intention to supersede the exercise by the state of its authority as to matters not covered by the federal legislation is not to be implied unless the Act of Congress, fairly interpreted is in conflict with the law of the state. Savage v. Jones, 225 U. S. 501, 533, 56 L. Ed. 1182, 32 S. Ct. 715; Atlantic Coast Line R. Co. v. Georgia, 234 U. S. 280, 293, 294, 58 L. Ed. 1312, 34 S. Ct. 829; Southern R. Co. v. R. R. Commission, 236 U. S. 439, 446, 59 L. Ed. 661, 35 S. Ct. 304; Ill. Cent. R. R. Co. v. State Public Utilities Commission, 245 U. S. 493, 510, 62 L. Ed. 425 [P. U. R. 1918C, 279], 38 S. Ct. 170; . . . Lehigh Valley R. Co. v. Public Utilities Com'rs, 278 U. S. 24, 35, 73 L. Ed. 161, 62 A. L. R. 805, 49 S. Ct. 69; International Shoe Co. v. Pinkus, 278 U. S. 261, 265, 73 L. Ed. 318, 49 S. Ct. 108. We find no such conflict in this case, as the approval of the Interstate Commerce Commission has been obtained, and its certificate of public convenience and necessity has been issued, in relation to the rearrangement, extensions and abandonment of tracks, and the use of the terminal facilities, involved in the pro-

posed plan, and nothing further was required by the Interstate Commerce Act."

In Claiborne-Annapolis Ferry Co. v. U. S. of America, 285 U. S. 382, 52 S. Ct. 440, 76 L. Ed. 808, it was held that: "The provisions of section 1, paragraphs 18, 19, and 20, of the Interstate Commerce Act [49 U. S. C. A., section 1, paragraphs 18-20] relating to the necessity of issuance of certificates of convenience and necessity by the Interstate Commerce Commission for a proposed addition to or extension of railroad lines, affect intrastate commerce only as that may be incidental to the effective regulation of interstate commerce."

It will be seen from these authorities that the Federal Transportation Act has not superseded state authority entirely, and that the power of the state to control intrastate commerce and contractual rights under the state powers heretofore recognized are not superseded any further than a fair interpretation of the Transportation Act makes necessary. The state's power over intrastate commerce is full and plenary, except as superseded or affected by the federal law. As seen by the decisions above referred to, Congress has not conferred the power on the Interstate Commerce Commission to take control of depots of various kinds.

We think the state and federal powers should operate, as far as they do so without conflict. We do not think that Congress has undertaken to provide what securities should be furnished to contractors, subcontractors, laborers, and journeymen for constructing a railroad wholly within one state, or running through more than one state. In general, matters regulating contracts are for the state, and Congress only makes such restrictions as are germane and proper for it to make.

We find nothing in the Transportation Act inconsistent with chapter 128, Laws 1918, in so far as the rights of contractors, subcontractors, journeymen, and laborers are concerned. In our judgment, Congress has not taken

possession of these matters so as to exclude the state law upon that subject.

There was some testimony, and some apparent conflict, as to the agreement between the appellants and the appellees when some of the alleged trust agreements were made. In the chancellor's view, the appellants had no rights under chapter 128, Laws 1918, and he subordinated the appellants' claim to that of the appellees.

We do not undertake to determine whether there was any waiver by any of the appellants in favor of the appellees, or any of them, but leave that matter to be determined by the chancellor after a remand of the case.

We do not think the chancellor should have directed the securities, that is, the stock and bonds, to be sold at public outcry for what they would then bring at said sale. Under the order of the Interstate Commerce Commission, these stocks and bonds were to be sold for at least par.

We think the appellants should have priority over the appellees as to the proceeds of these bonds, unless by some agreement or contract they have waived these rights, and that the decree ordering a sale of these securities should be modified so as to require that they bring par, and, in default of a sale of these securities at par, that a lien be declared in favor of the appellants against the railroad embankments, or so much thereof as is situated in the state of Mississippi.

We do not deem it necessary to decide the other questions presented by the record, and the judgment of the court below will be reversed and the cause remanded for further proceedings.

Reversed and remanded.