Appellant paid under protest certain premium and privilege taxes which had accrued during the last six months of the year 1944, pursuant to the requirements of Code 1942, Section 9537. It propounded its claim for refund in accordance with Chapter 127, Laws of 1944, which was denied, hence this appeal.
Under Section 9537, appellant, a nonresident mutual insurance company authorized to do business in this *Page 241 
State, was required to pay an annual privilege or premium tax equal to two and one-fourth per cent. of the gross premiums received from contracts or insurance policies written or covering risks in this State, whereas local companies are required to pay a tax of only one-half that amount against which the amount of their ad valorem taxes may be credited or taken into account. Certain exemptions or deductions applicable alike to both foreign and domestic companies are not here detailed. The attack is upon the constitutionality of Section 9537 as violating Art. 1, Sec. 8, Cl. 3 of the Constitution of the United States, and Sec. 1, Art. XIV of the Bill of Rights, and Sec. 14, Miss. Constitution.
It must at the outset be conceded that the tax is unequal and discriminatory. We address ourselves solely to the necessary effect of such inequality upon the validity of Section 9537.
For three-quarters of a century our Federal Supreme Court resisted all pressures applied to compel a classification of the business of insurance as interstate commerce. Indeed it disavowed its status even as commerce. By excluding it from this category, it suffered it to be subjected to local regulation, taxation and even discrimination.
The attacks were at the outset with ordnance from the armory of the 14th Amendment. The losing cause lamented its impotency to stem the advance of state control and now and then hefted the long range weapons of the commerce clause, bewailing their unavailability. An early hint that such armament might some day be utilized was insinuated into the opinion in New York Life Ins. Company v. Deer Lodge County, 231 U.S. 495, 34 S.Ct. 167, 58 L.Ed. 332, where the refusal to set aside discriminatory state regulation of foreign insurance business was based upon assumption that it was not interstate commerce.
While the field of insurance afforded room only for an occasional doubt as to its character as interstate commerce, *Page 242 
and repeated contrary decisions began to lend color to congressional action, the boundaries of constitutional limitations under the commerce clause were in other areas being gradually shifted. From the concept that the commerce clause ex proprio vigore prohibits state regulation of interstate commerce, there has evolved a mass of exceptions. Early in the judicial history of this clause divergence asserted itself. In the License Cases, 5 How. 504, 578, 12 L.Ed. 256, Chief Justice Taney expressed the view that as long as Congress had not acted, the states were free to act. This is in contrast with Chief Justice Marshall's ideas as expressed twenty-three years before in Gibbons v. Ogden, 9 Wheat. 1, 6 L.Ed. 23. Later, cases dealing with the same subject matter — the transportation of intoxicating liquors — enlarged the regulatory powers of the states by the congressional device of withholding, by direct enactment, the federal power. Whether this was more than a concession to local police powers, or the early outcropping of a national policy of collaboration, is not here so important as the fact that the constitutional limitations upon state power were found mobile and not susceptible of a rigid and permanent fixation. Cf. In re Rahrer, 140 U.S. 545, 11 S.Ct. 865, 35 L.Ed. 572; Leisy v. Hardin, 135 U.S. 100, 10 S.Ct. 681, 34 L.Ed. 128.[1] *Page 243 
Narrow views as to the exclusive power of the Congress in this regard yielded perceptibly to those evolutionary economic processes which recognized that there was no inherent repugnancy between the mere right of Congress to act and a control exercised by a state on a matter of local concern.[2]
The regulation by Congress of merely one aspect of an interstate business no longer carried presumptive evidence of its complete occupation of the entire field. Terminal Railroad Ass'n v. Brotherhood of Railroad Trainmen, 318 U.S. 1, 63 S.Ct. 420, 87 L.Ed. 571. The adoption of the Sherman Anti-Trust Act 15 U.S.C.A., Secs. 1-7, 15 note, was held to have exhausted the constitutional powers of the Congress to regulate interstate commerce. See Apex Hosiery Company v. Leader, *Page 244 310 U.S. 469, 495, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044; Atlantic Cleaners Dyers v. United States, 286 U.S. 427, 435, 52 S.Ct. 607, 76 L.Ed. 1204. The conclusion is there justified that the proper cataloguing of insurance business as interstate commerce involves invocation of both constitutional and statutory questions. The Sherman Act, construed in United States v. Southeastern Underwriters Ass'n, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440, as well as other federal acts were enacted during a period when the Congress conceived its powers as much more restricted than in modern years. See American Medical Ass'n v. United States, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434; Associated Press v. National Labor Relations Board, 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953. Recognition of evolutionary economic and political processes and theories is readily discoverable in the elastic content of the constitution as judicially interpreted. Both the Congress and the Supreme Court interpreted their official acts in terms of the assumed meaning and purpose of the statutes and the expressed interpretation by judicial opinions. Even the Sherman Act itself became pliable under the heat generated by friction between state and federal power, and yielded rigidity under the pressure of more realistic notions.[3] *Page 245 
In Appalachian Coals, Inc. et al. v. United States, 288 U.S. 344, 359, 53 S.Ct. 471, 474, 77 L.Ed. 825, the court stated: "the act has a generality and adaptability comparable to that found to be desirable in constitutional provisions."
Much of the discussion of suitable tests for unlawful discrimination, of course, is derived from problems affecting concededly interstate commerce. Yet, it is in point to sketch some of the trends in view of the final determination to place insurance business in the interstate commerce pigeonhole, in the Southeastern Underwriters case, discussed hereinafter.
After judicial minds had been adjusted to the acceptance of state regulation in local matters and of the implied concessions through failure of federal action, discrimination against interstate commerce was hailed as tainting ex proprio vigore all state control or regulation. This conception was short lived. "Discrimination" as such was no longer a magic skeleton key with which to unlock the defending gates of state power. Indeed, such discrimination must be more than merely onerous (Lincoln Nat. Life Ins. Company v. Read, 325 U.S. 673, 65 S.Ct. 1220, 89 L.Ed. 1861; City of Jackson v. Mississippi Fire Ins. Company, 132 Miss. 415, 95 So. 845; Miller v. Lamar Life Ins. Company, 158 Miss. 753,131 So. 282); it must be burdensome. More than this, it must be unduly or unreasonably so. Anderson Nat. Ass'n v. Luckett,321 U.S. 233, 64 S.Ct. 599, 607, 88 L.Ed. 692, 151 A.L.R. 824; Nelson v. Sears, Roebuck Company, 312 U.S. 359, 61 S.Ct. 586, 85 L.Ed. 888, 132 A.L.R. 475; General Trading Company v. State Tax Commission, 322 U.S. 335, 349, 64 S.Ct. 1028, 1030, 88 L.Ed. 1309, 1319; McGoldrick v. Berwind-White Coal Mining Company,309 U.S. 33, 60 S.Ct. 388, 84 L.Ed. 565, 128 A.L.R. 876; *Page 246 
South Carolina Highway Department v. Barnwell Brothers,303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. 734; Nippert v. City of Richmond, 66 S.Ct. 586; 51 Am. Jur. 274. That a statute merely affects or its incidence is upon interstate commerce is not enough. New Orleans, M. C.R. Company v. State, 110 Miss. 290, 70 So. 355; State of Wisconsin v. J.C. Penney Co., 311 U.S. 435, 61 S.Ct. 246, 85 L.Ed. 267, 130 A.L.R. 1229. Even a `substantial effect' thereupon is not alone decisive. Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315.
The power of the states to regulate interstate commerce and contractual rights is not superseded by congressional action to any greater extent than a fair interpretation requires. See Gulf States Creosoting Company v. Southern Finance, Etc., Corporation et al., 166 Miss. 714, 146 So. 860.
Yardsticks of undue discrimination fashioned from legalistic concepts were found subject to constant readjustment to local atmospheric conditions. Frequent allowance was found necessary to compensate for fluctuations in the comparative extent of state and national interest. The result of discrimination as a criterion yielded inexorably to the causes therefor, and facts emerged as triumphant over legal theory inasmuch as the law in each case was the creature of its circumstances. Purely mechanistic tests were sometimes applied, as in Parker v. Brown, supra, where the regulation occurred before the interstate journey began. Yet, the Court had stated in McGoldrick v. Berwind-White Coal Mining Company, supra, "Despite mechanical or artificial distinctions sometimes taken between the taxes deemed permissible and those condemned, the decisions appear to be predicated on a practical judgment as to the likelihood of the tax being used to place interstate commerce at a competitive disadvantage."[4] *Page 247 
Considerations of public policy and the balancing of the federal and state interests affected commended themselves to the court. Discriminations between local and interstate commerce found an overriding counterpart in the unequal discriminations by the federal government against the state in cases where a matter of only technical concern nationally was by a judicial rule of thumb denied regulation by the state whose interests, gauged economically, were alone substantially affected. Contrasting of relative burdens and benefits was resorted to in Parker v. Brown, supra; Terminal Railroad Ass'n v. Brotherhood, supra.[5] *Page 248 
A duty to recognize the "rightful independence of state governments in carrying out their domestic policy" is found in Burford v. Sun Oil Company, 319 U.S. 315, 63 S.Ct. 1098, 1108, 87 L.Ed. 1424, citing Commonwealth of Pennsylvania v. Williams,294 U.S. 176, 185, 55 S.Ct. 380, 79 L.Ed. 841, 96 A.L.R. 1166, and in doing so it likewise held in Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 501, 61 S.Ct. 643, 645, 85 L.Ed. 971, that it was "[thereby] furthering the harmonious relation between state and federal authority without the need of rigorous congressional restriction of those powers." Tax burdens imposed by the state are no longer condemned by mechanical formulas since "there are many forms of tax whose burdens when distributed through the play of economic forces, affect interstate commerce, which nevertheless fall short of the regulation of the commerce which the Constitution leaves to Congress." McGoldrick v. Berwind-White Co., supra.[6]
Part of the judicial heritage of Paul v. State of Virginia, 8 Wall. 168, 19 L.Ed. 357, and the cases which followed in its train, was the cumulative effect of the *Page 249 
continual attack upon the courts for their alleged usurpation of purely legislative functions implicit in their testing upon the scales of the 14th Amendment the relative weight of conflicting state and national interests. In this connection, Mr. Justice Stone, who wrote the opinion in Parker v. Brown, supra, and who there applied the foregoing test, had stated in South Carolina Highway Department v. Barnwell Brothers, supra [303 U.S. 177, 58 S.Ct. 516]: "Congress . . . may determine whether the burden imposed on it by state regulation, otherwise permissible, are too great, and may . . . curtail to some extent the state's regulatory power. But this is a legislative, not a judicial function, to be performed in the light of the congressional judgment of what is appropriate regulation of interstate commerce, and the extent to which, in that field, state power and local interests should be required to yield to the national authority and interest . . ." Such view gained additional sanction in the three dissents in McCarroll v. Dixie Greyhound Lines, 309 U.S. 176, 184, 60 S.Ct. 504, 84 L.Ed. 683, led by Mr. Justice Black who wrote the controlling opinion in the Southwestern Underwriters Ass'n case, supra. The competing, if not conflicting, power of Congress to permit state regulation of commerce which would otherwise be unconstitutional was conceded in Re Rahrer, supra, and definitely approved in Southern Pacific Company v. State of Arizona, 325 U.S. 761, 65 S.Ct. 1515, 1519, 89 L.Ed. 1915, where it was pointed out that "The states may regulate matters which, because of their number and diversity, may never be adequately dealt with by Congress," and further that "Congress has undoubted power to redefine the distribution of power over interstate commerce." The Court agreed in Helvering v. Griffiths, 318 U.S. 371, 400, 63 S.Ct. 636, 652, 87 L.Ed. 843, that the legislative branch should not suffer "embarrassment if in the performance of its duty a legislative body feels impelled to enact laws which may require the Court to re-examine its previous judgments *Page 250 
or doctrine." To this end, actual discrimination was rendered less forbidding to judicial gaze by being arrayed in the garb of "reasonableness," "joint power," "harmony," and "public interest."
The foregoing elaboration of legislative and judicial trends has risked tedium in documenting the conclusion that the constitutional power of Congress exclusively to regulate interstate commerce does not imply a duty to do so exclusively, and that its duty involves the power to supervise and accept such state regulation as it deems "in the public interest." There is no incongruity in our conclusion that no pragmatic test is conclusive, and that the only definite truth refined from the mass of conflicting decisions is that there is no definite legal pattern by which discrimination can be analyzed for traces of illegality.
Prolonged though our recitals may be, they are mere gleanings from a bulk of decisions which reflect the fluctuating battle lines in the struggle between the forces of ruthless dogma and of appeasement. Traces of the uncertainties both of national policy and of constitutional limitation descending often to judicial dissension are reproduced in the Southeastern Underwriters decision, and season the utterances of both the controlling and the dissenting opinions. Let us examine that case. United States v. Southeastern Underwriters Ass'n, 322 U.S. 533, 64 S.Ct. 1162, 1170, 88 L.Ed. 1440.
By this decision, the insurance business was suddenly snatched from state custody, confined within the commerce clause and subjected to the rigorous domination of the Sherman Act. The sudden detonation in an area that had never suffered federal invasion not only dislocated established state economic structures but threatened approved foundations of state policy. Repercussions echoed throughout the halls of the Congress and spent their force in dissertation and debate. It may safely have been assumed that the Court which provoked and envisioned such chaos was not unaffected. *Page 251 
It is not enough merely to state that the insurance business was finally identified by an interstate commerce brand. Such conclusion was an important incident in making it subject to prosecution under the anti-trust laws. The significant feature of the decision, made relevant by the instant case, is that regardless of the outcome of the criminal proceedings the interstate label is indelible. The mere circumstance that this revolutionary decision was through fortuitous circumstances handed down by a minority of the entire Court is relevant only in that this may have provoked a franker disclosure of judicial anxieties as to the benumbing effect upon areas outside the particular target upon which the judicial power was loosed.
We detect misgivings even on the majority opinion itself. The Court found it more important to consider "the result of the cases which follow Paul v. [State of] Virginia" than the cases themselves, none of which were overruled. With an anxious side glance at the dislocations of state structures, the Court stated: "Another reason advanced to support the result of the cases which follow Paul v. [State of] Virginia has been that, if any aspects of the business of insurance be treated as interstate commerce, `then all control over it is taken from the states and the legislative regulations which this court has heretofore sustained must be declared invalid.' Accepted without qualification, that broad statement is inconsistent with many decisions of this Court. It is settled that, for Constitutional purposes, certain activities of a business may be intrastate and therefore subject to state control, while other activities of the same business may be interstate and therefore subject to federal regulation. And there is a wide range of business and other activities which, though subject to federal regulation, are so intimately related to local welfare that, in the absence of Congressional action, they may be regulated or taxed by the states. In marking out these activities the primary test applied by the Court is not the mechanical one of *Page 252 
whether the particular activity affected by the state regulation is part of interstate commerce, but rather whether, in each case, the competing demands of the state and national interests involved can be accommodated. And the fact that particular phases of an interstate business or activity have long been regulated or taxed by states has been recognized as a strong reason why, in the continued absence of conflicting Congressional action, the state regulatory and tax laws should be declared valid."[7]
Moreover, the power to govern interstate intercourse was held to be "vested in the Congress, available to be exercised for the national welfare as Congress shall deem necessary." The dissenting opinions were fraught with fears that the incidental effects of the decision would be more destructive than the asserted advantage would justify. Attempts of the majority to lull these anxieties were met with direful predictions as to disastrous displacement of local anchorages. Mr. Justice Jackson stated: "The states began nearly a century ago to regulate insurance, and state regulation, while no doubt of uneven quality, today is a successful going concern. Several of the states, where the greatest volume of business is transacted, have rigorous and enlightened legislation, with enforcement and supervision in the hands of experienced and competent officials. Such state departments, *Page 253 
through trial and error, have accumulated that body of institutional experience and wisdom so indispensable to good administration. The Court's decision at very least will require an extensive overhauling of state legislation relating to taxation and supervision. The whole legal basis will have to be reconsidered. What will be irretrievably lost and what may be salvaged no one now can say, and it will take a generation of litigation to determine. Certainly the states lose very important controls and very considerable revenues. The recklessness of such a course is emphasized when we consider that Congress has not one line of legislation deliberately designed to take over federal responsibility for this important and complicated enterprise." *Page 254 
Emphasis upon the exclusive power of Congress to regulate interstate commerce carried equal stress upon its exclusive responsibility so to do. In the controlling opinion it is said "Having power to enact the Sherman Act, Congress did so; if exceptions are to be written into Act, they must come from Congress, not this Court." That such determinations should be solved legislatively and not judicially were expressed also in the dissenting opinion of Mr. Justice Jackson, "The orderly way to nationalize insurance supervision, if it be desirable, is not by court decision but through legislation."[8]
Reference to both controlling and dissenting opinions are found relevant to the inquiry whether the Court as presently constituted intended a ruthless cutting down of all state power or whether, quailing before the envisaged economic chaos, conceded that considerations of public interest would break the fall of dislodged state power and preserve it against benumbing shock. Such *Page 255 
a consummation, devoutly wished, is more than a mere softening of an impending blow; it is grounded upon a policy not at all inconsistent with the spirit of the Constitution itself, that the welfare of the whole people is the supreme law.[9]
The McCarran-Ferguson Act. This Act, March 9, 1945, 59 Stat. 33, 15 U.S.C.A., Sec. 1011 et seq., is in part as follows: "Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States. *Page 256 
"Sec. 2. (a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.
"(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: Provided, That after January 1, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.
"Sec. 3. (a) Until January 1, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, and the Act of June 19, 1936, known as the Robinson-Patman Anti-discrimination Act, shall not apply to the business of insurance or to acts in the conduct thereof."
The history of this Act has already been anticipated by our former references thereto. Its purpose, readily deduced, is confirmed by the expression of its sponsor upon the floor of the United States Senate.[10] *Page 257 
We retain no doubts that the Act effectuated these expressed purposes, and that it took into account the implications of the several judicial expressions in the Southeastern Underwriters case which compounded from its fears and its concessions an amalgam of assurance of validity to any cushioning legislation by which the Congress should "in the public interest" bring to a gradual stop the moving power of the states, to which the Court itself had lent momentum, without a disastrous skidding of state wheels.
There remains only the inquiry whether Congress exceeded constitutional limitations in authorizing discrimination. We have at length indicated tests by which the weight of such burden may be counter-balanced or neutralized by considerations of public interest. The stop sign set up by the Southeastern Underwriters case has under fiat of the Court itself shifted to the green of judicial sanction, not, however, without an intermediate cautionary signal. We deem it within our competence to construe the decision as an augury of judicial affirmance of the device by which the Congress has solved the dilemma which the Court provoked.[11] *Page 258 
The "predominant national concern," on occasion (e.g. Southern Pacific Company v. State of Arizona, supra) utilized as a formula for adjudging repugance, may well support the emergency action of Congress in interposing this Act, by subordinating, for a brief season, the narrow issue between local and interstate commerce to realistic considerations which penetrate beneath the words of our Constitution and divine its spirit.
Our views find accord in the decisions of other state courts to which we are content merely to make citation: The following state cases discuss the South-Eastern Underwriters case and support our conclusion with reference to same: Prudential Ins. Co. v. Forbes, No. 25,224 in Circuit Ct. of Ingham County, Michigan, decided Aug. 21, 1945; Insurance Tax Cases, 160 Kan. 300, 161 P.2d 726; First Nat. Ben. Soc. v. Garrison (D.C.), 58 F. Supp. 972; Keehn v. Hi-Grade Coal Fuel Co., 23 N.J. Misc. 102, 41 A.2d 525; Ware v. Travelers Ins. Co., 9 Cir., 150 F.2d 463; Mendola v. Dineen, 185 Misc. 540, 57 N.Y.S.2d 219; Prudential Ins. Co. v. Benjamin, 66 S.Ct. 1142; Prudential Ins. Co. v. Murphy,207 S.C. 324, 35 S.E.2d 586, (S. Car.); State v. Prudential Ins. Co. (Ind. Sup.), 64 N.E.2d 150.
It is our considered conclusion that the Congress, by vouchsafing to the states a period of armistice within which to make orderly withdrawal from the field with salvage of its stores, has thereby constitutionally promoted the general welfare.
Affirmed.[12]
[1] In the latter case, the Wilson Act, 27 U.S.C.A. sec. 121, and its successor, the Webb-Kenyon Act of 1913, 27 U.S.C.A. sec. 122, by withdrawing its congressional bodyguards, left these articles of interstate commerce to the mercy of the state legislatures. In spite of vigorous attack upon the Act as an abdication by Congress of a portion of its authority over interstate commerce, the Supreme Court upheld the legislation, significantly stressing that after all it was the will of Congress which made the prohibitions effective.
In this connection, compare the recent expression of the Court in Girouard v. United States, 66 S.Ct. 826, 834, "It is not the function of this Court to disregard the will of Congress in the exercise of its constitutional power."
The power to prohibit altogether the use of the facilities of interstate commerce in certain cases was upheld, insofar as the particular product or practice was considered, in the Lottery Cases (Champion v. Ames), 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492, the white slave traffic, Hoke v. United States,227 U.S. 308, 33 S.Ct. 281, 57 L.Ed. 523, 43 L.R.A., N.S., 906, Ann. Cas. 1913E, 905, and in food drugs cases. Yet, in Hammer v. Dagenhart, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101, 3 A.L.R. 649, Ann. Cas. 1918E, 724, the Court held that the problem of child labor was purely local and outside the competence of Congress to control. Such are familiar examples of definitions of congressional power in terms of the subject regulated.
[2] In Leisy v. Hardin, supra [135 U.S. 100, 10 S.Ct. 684], the Court broke away from the federal jealousy enunciated in the thirty-second number of the Federalist which saw in the existence of concurrent power a constitutional anomaly. The Court stated: "Whenever, however, a particular power of the general government is one which must necessarily be exercised by it, and Congress remains silent, this is not only not a concession that the powers reserved by the states may be exerted as if the specific power had not been elsewhere reposed, but, on the contrary, the only legitimate conclusion is that the general government intended that power should not be affirmatively exercised, and the action of the states cannot be permitted to effect that which would be incompatible with such intention. Hence, inasmuch as interstate commerce, consisting in the transportation, purchase, sale, and exchange of commodities, is national in its character, and must be governed by a uniform system, so long as congress does not pass any law to regulate it, or allowing the states so to do, it thereby indicates its will that such commerce shall be free and untrammeled . . ."
[3] It is certain that when the Act was passed Congress had long been exposed to the opinions of the Supreme Court upon the state power over insurance business, beginning with Paul v. State of Virginia, 8 Wall. 168, 19 L.Ed. 357. In fact, the Congress purposefully exempted marine insurance business from the prohibitions of the anti-trust laws in the Merchant Marine Act, 41 Stat. 1000, 46 U.S.C.A. Sec. 885. Among the several bills introduced into the Congress to meet the decision, in the Southeastern Underwriters case, was the Bailey-Van Nuys Bill, S. 1362, 78th Cong., 1st Sess., which forth-rightly declared that it was the intent of Congress to exempt the insurance business from the provisions of the Sherman Act. At the same time the O'Mahoney-Hatch Bill was offered and incorporated within it an expressed purpose to allow the states a period of moratorium during which the several states could adjust their laws to the provisions of the anti-trust laws and of the Constitution. The McCarran-Ferguson Act, proposed as a substitute for the former bill and later adopted, will be discussed later. The foregoing references reinforce the fact of mutual deference to, and influence upon, the economic and political philosophies respectively of the federal legislative and judiciary departments.
[4] Factual tests were resorted to, for example, in Milk Control Board v. Eisenberg Farm Products, 306 U.S. 346, 353, 59 S.Ct. 528, 83 L.Ed. 752; People of State of California v. Thompson, 313 U.S. 109, 61 S.Ct. 930, 85 L.Ed. 1219; and Terminal Railroad Ass'n v. Brother-Hood, supra. Tests according to whether the burden was direct or indirect had their day. Di Santo v. Commonwealth of Pennsylvania, 273 U.S. 34, 47 S.Ct. 267, 71 L.Ed. 524; Lemke v. Farmers' Grain Co., 258 U.S. 50, 42 S.Ct. 244, 66 L.Ed. 458; Sligh v. Kirkwood, 237 U.S. 52, 35 S.Ct. 501, 59 L.Ed. 835. Their repudiation was forecasted in the dissent in the Di Santo case, and the Court has again swung back to the pragmatic tests originally advanced in Cooley v. Society for Relief of Distressed Pilots, Their Widows and Children, Board of Wardens, 12 How. 299, 317, 13 L.Ed. 996. See South Carolina, Highway Dept. v. Barnwell Bros., supra; Milk Control Board v. Eisenberg Farm Products, supra; Wickard v. Filburn, 317 U.S. 111, 123, 63 S.Ct. 82, 87 L.Ed. 122.
[5] That which was asserted in the dissent of Justice Murphy in Pacific Coast Dairy v. Department of Agriculture, 318 U.S. 285, 295, 63 S.Ct. 628, 87 L.Ed. 761, is to be subjected to trial by contrast with the majority holding in Hoopeston Canning Company v. Cullen, 318 U.S. 313, 63 S.Ct. 602, 87 L.Ed. 1722, 145 A.L.R. 1113. The two cases were handed down the same day. In the former, it was stated [318 U.S. 285, 63 S.Ct. 635]: "We derive much of our strength as a nation from our dual system of federal government. To promote the harmonious working of that system the general clauses of the Constitution which broadly delineate the boundaries of state and national power should be construed by appraising the respective state and national interests involved and striking a balance which gives appropriate recognition to the legitimate concerns of each government. Since those boundaries are not absolute, the question necessarily is one of reasonableness and degree." In the latter case, the declaration was [318 U.S. 313, 63 S.Ct. 605]: "In determining the power of a state to apply its own regulatory laws to insurance business activities, the question in earlier cases became involved by conceptualistic discussion of theories of the place of contracting or of performance. More recently it has been recognized that a state may have substantial interests in the business of insurance of its people or property regardless of these isolated factors. This interest may be measured by highly realistic considerations such as the protection of the citizen insured or the protection of the state from the incidents of loss."
[6] In a recent case, Nippert v. City of Richmond, 66 S.Ct. 586, 592, a state discriminatory tax against interstate transactions was held invalid because "the small operator . . . will find the tax not only burdensome but prohibitive with the result that the commerce is stopped before it is begun," and also because "the tax thus inherently bore no relation to the volume of business done or of the returns from it." Neither of these elements is here present. The appellant calls attention to its long and prosperous business under the regulation and protection of our state laws. The tax is ratable and is seen as discriminatory merely, not unduly burdensome.
[7] Significance may be found in the incident that the opinion quotes the dictum of Justice McKenna in New York Life Ins. Company v. Deer Lodge County, supra. Yet, the language of the quoted opinion was not "if any aspects of insurance be treated as commerce," but "if . . . insurance is commerce," a distinction whose importance was considerable at the time the Deer Lodge case was decided.
What the writer of the opinion in the Southeastern Underwriters case meant and what his concurring associates understood him to mean may be gleaned from his former opinions, particularly Hoopeston Canning Co. v. Cullen, quoted above, and decided only a year prior to the Southeastern Underwriters case. From his dissent in McCarroll v. Dixie Greyhound Lines, 309 U.S. 176, 183, 185, 60 S.Ct. 504, 509, 84 L.Ed. 683, we quote the following: "Our disagreement with the opinions just announced does not arise from a belief that Federal action is unnecessary to bring about appropriate uniformity in regulations of interstate commerce. Indeed, state legislation recently before this Court indicates quite the contrary. For instance, we sustained the right of South Carolina — in the absence of congressional prohibition — to regulate the width and weight of interstate trucks using her highways, even though the unassailed findings showed that a substantial amount of interstate commerce would thereby be barred from the State. South Carolina Highway Dept. v. Barnwell Bros. We did not thereby approve the desirability of such state regulations. It is not for us to approve or disapprove. We did decide that `courts do not sit as Legislatures, either state or national. They cannot act as Congress does when, after weighing all the conflicting interests, state and national, it determines when and how much the state regulatory power shall yield to the larger interests of national commerce.'" The writer quotes from Chief Justice Taft's comment on Board of Trade of City of Chicago v. Olsen, 261 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839, upon Swift 
Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518, "That case was a milestone in the interpretation of the commerce clause of the Constitution. It recognized the great changes and development in the business of this vast country and drew again the dividing line between interstate and intrastate commerce where the Constitution intended it to be. It refused to permit local incidents of a great interstate movement, which taken alone were intrastate, to characterize the movement as such. The Swift case merely fitted the commerce clause to the real and practical essence of modern business growth." [261 U.S. 1, 43 S.Ct. 477.]
[8] The writer of this dissent had in mind, for he quoted from, New York Life Ins. Co. v. Deer Lodge County, supra [231 U.S. 495, 34 S.Ct. 169], that: "To reverse the cases, therefore, would require us to promulgate a new rule of constitutional inhibition upon the states, and which would compel a change of their policy and a readjustment of their laws. Such result necessarily urges against a change of decision." The Chief Justice also dissenting stated: "But the immediate and only practical effect of the decision now rendered is to withdraw from the states, in large measure, the regulation of insurance and to confer it on the national government, which has adopted no legislative policy and evolved no scheme of regulation with respect to the business of insurance." It was he who had written the opinion in South Carolina Highway Dept. v. Barnwell Brothers, supra, from which quotation has already been made. His views are further revealed in his address to the Court, set out in 309 U.S. VII, 60 S.Ct. CXL, "The future of the Court may depend more upon the competence of the executive and legislative branches of government to solve their problems adequately and in time than upon the merit which is its own." Criticism by the Court of itself for assuming "super-legislative" functions was wrung by the force of public policy from the convictions of the Court in Jay Burns Baking Company v. Bryan, 264 U.S. 504, 534, 44 S.Ct. 412, 68 L.Ed. 813, 32 A.L.R. 661, and reiterated in the dissents in Southern Pacific Company v. Arizona, supra.
[9] The writer of the opinion in the Southeastern case later dissented in Southern Pacific Co. v. State of Arizona, supra, where he stated "The determination of whether it is in the interest of society . . . is a matter of public policy . . .; a century and a half of constitutional history and government admonishes this Court to leave that choice to the elected legislative representatives of the people themselves, where it properly belongs both on democratic principles and the requirements of efficient government." Further brief analysis of individual conceptions of members of the Court, as well as of the Court for which they spoke, may well include its latest expressions. In Reconstruction Finance Corporation v. County of Beaver, 66 S.Ct. 992, 996, the Court was construing a state statute which subjected the real property of governmental agencies to local taxation. The author of the opinion in the Southeastern Underwriters case stated: "The fact that Congress subjected Defense Plant Corporation's properties to local taxes `to the same extent according to its value as other real property is taxed' indicated an intent to integrate Congressionalpermission to tax with established local tax assessment and collection machinery.'" (Italics supplied.) In Queenside Hills Realty Company, Inc., v. Saxl, 66 S.Ct. 850, 852, Mr. Justice Douglas stated "So far as we know, the 1944 law (Multiple Dwelling Law of New York [Consol. Laws, c. 61-A]) may have been designed as stop-gap measure to take care of a pressing need until more comprehensive legislation could be prepared." The analogy to the McCarran Act is obvious.
[10] It was there asserted by Senator McCarran: "It is not the intention of Congress in the enactment of this legislation to clothe the State with any power to regulate or tax the business of insurance beyond that which they had been held to possess prior to the decision of the United States Supreme Court in the Southeastern Underwriters Association case. Briefly, your committee is of the opinion that we should provide for the continued regulation and taxation of insurance by the States, subject, always, however, to the limitations set out in the controlling decisions of the United States Supreme Court, as, for instance in Allgeyer v. State of Louisiana, 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832; St. Louis Cotton Compress Co. v. State of Arkansas, 260 U.S. 346, 43 S.Ct. 125, 67 L.Ed. 297; and Connecticut General Insurance Co. v. Johnson, 303 U.S. 77, 58 S.Ct. 436, 82 L.Ed. 673." This view is fortified by the views of another proponent (Senator O'Mahoney who had sponsored the O'Mahoney-Hatch bill to extend a moratorium similar to that adopted in the McCarran Act) that the bill was not intended "`to delegate to any State the power to legislate in the field of interstate and foreign commerce,' and that the Conference Report `would give to the States, to Congress and to industry the opportunity so to adjust the laws and insurance practices as to bring clarity into the whole situation . . . an invitation to the states to legislate in good faith' (Cong. Rec., Vol. 91, p. 1554)".
[11] Compare Barnette v. West Virginia State Board of Education, D.C., 47 F. Supp. 251, decided in the face of the Gobitis case (Gobitis v. Minersville School Dist.), 310 U.S. 586, 60 S.Ct. 1010, 84 L.Ed. 1375, 127 A.L.R. 1493, and Jones v. City of Opelika, 316 U.S. 584, 62 S.Ct. 1231, 86 L.Ed. 1691, 141 A.L.R. 514, but upon the assurances of the dissenting opinions in the latter case.
[12] The foregoing opinion was written prior to the decision in Prudential Ins. Company v. Benjamin, 66 S.Ct. 1142, upon the eve of the rendition of our decision, which, being in accord with the Benjamin case, will be handed down as prepared. *Page 259